UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| BLAINE WILMOTTE and MADISON WILMOTTE,<br><br>                Plaintiffs,<br>    v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,<br><br>                Defendant. | CASE NO. C18-0086 BHS<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON PUNITIVE DAMAGES |

This matter comes before the Court on Defendant National Railroad Passenger Corporation d/b/a Amtrak's ("Amtrak") motion for summary judgment on punitive damages. Dkt. 44. The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On January 4, 2018, Plaintiffs Blaine and Madison Wilmotte ("Wilmottes") filed a complaint for damages against Amtrak in King County Superior Court for the State of

Washington. Dkt. 1-2. In relevant part, the Wilmottes seek pecuniary and exemplary damages. *Id.* ¶ 6.1.

On January 19, 2018, Amtrak removed the matter to this Court. Dkt. 1.

On June 27, 2019, Amtrak filed the instant motion seeking dismissal of the Wilmottes' claims for punitive damages. Dkt. 44.[1] On July 29, 2019, the Wilmottes responded. Dkt. 54. On August 8, 2019, Amtrak replied. Dkt. 58.

## II. FACTUAL BACKGROUND

The majority of the facts relevant to this motion are undisputed. The Amtrak Cascades line operates from Eugene, Oregon to Vancouver, British Columbia. On December 18, 2017, Amtrak began service on a new section of track on the Cascades line, which bypassed Point Defiance ("Point Defiance Bypass"). This section of track is approximately 20 miles and runs from Olympia to Tacoma, Washington. A part of the section is commonly referred to as the Lakewood Subdivision. Sound Transit is a public transit authority serving the nearby communities, owns the Lakewood Subdivision, and operates as a host railroad for Amtrak.

In response to an Amtrak derailment outside of Philadelphia in 2015, Congress passed the Fixing America's Surface Transportation Act ("FAST Act"), PL 114-94, 129 Stat. 1312. In certain situations, the FAST Act required railroad carriers to "identify each main track location where there is a reduction of more than 20 miles per hour from the approach speed to a curve, bridge, or tunnel." § 11406, 129 Stat. at 1684–85. Railroad

---

[1] Amtrak states that this motion also applies to the consolidated cases of *Harris v. Amtrak*, C18-134BHS and *Skyllingstad v. Amtrak*, C18-648BHS. Dkt. 44 at 1 n.1.

carriers were required to develop speed limit action plans including "increased crew communication," to prevent overspeed derailments at the identified track locations. *Id.* Importantly, the carrier, in this case Amtrak, was responsible for meeting the requirements of the Fast Act and not the host railroad, Sound Transit. *Id.*

It is undisputed that Amtrak failed to comply with the FAST Act's requirements for the inaugural run on the Point Defiance Bypass. At milepost 19.8 ("MP 19.8") of the Lakewood Subdivision, there is a 49 mile per hour ("mph") speed reduction curve where trains must reduce their speed from 79 mph to 30 mph. Neither Amtrak's regional safety office, located in Seattle, Washington, nor Amtrak's national safety office, located in Wilmington, Delaware, included any warning of the MP 19.8 speed reduction curve in its General Order for the territory covering the Point Defiance Bypass. The General Order provides the instructions for all Amtrak employees operating in the specific geographic area. Dkt. 55-9 at 2.[2] The order is intended to include a list of all FAST Act locations, and the order instructs the conductor to verbally remind the locomotive engineer of the upcoming speed reduction location. *Id.* at 34–35.

The parties dispute which office is to blame for failing to include the speed reduction curve at MP 19.8 in the General Order. Although the parties have each submitted voluminous evidence in support of their respective positions, the Court declines to summarize this evidence because the evidence supports a conclusion that Amtrak employees in both Seattle and Delaware were negligent by omission regarding

---

[2] Electronic case file pagination.

this speed reduction curve.  Solely for the purposes of the instant motion, the Court will give the Wilmottes the benefit of the doubt in finding that Amtrak's Delaware employees were more negligent than the Seattle employees, which is itself a dubious conclusion.[3]

On December 17, 2018, the inaugural run, Amtrak 501, left the Amtrak station at Tacoma, Washington heading toward MP 19.8.  As the train approached the curve, the conductor failed to verbally remind the engineer of the need to reduce the train's speed to 30 mph.  The train entered the curve at a high rate of speed, derailed, and resulted in a horrible accident killing three passengers and injuring numerous others, including the Wilmottes when train cars landed on the interstate highway under the curve.

### III.  DISCUSSION

In this case, the Wilmottes seek pecuniary and exemplary damages.  *Id*. ¶ 6.1. Under Washington tort law, however, punitive damages are not allowed.  Thus, the Wilmottes seek these damages under the laws of Delaware.

"In resolving conflict of law tort questions, Washington has abandoned the *lex loci delicti* rule and follows the *Restatement (Second) of Conflict of Laws'* most significant relationship test."  *Singh v. Edwards Lifesciences Corp.*, 151 Wn. App. 137, 143 (2009) (citing *Johnson v. Spider Staging Corp.*, 87 Wn.2d 577, 580 (1976)).  This is a two-step inquiry involving a weighing of the parties' contacts with the two jurisdictions and then, if the contacts are evenly balanced, evaluating the public policies and governmental interests of the concerned states."  *Id*. at 143–44 (citing *Johnson*, 87 Wn.2d at 58–82).

---

[3] The great weight of the evidence supports the conclusion that the majority of the acts causing the incident occurred in Washington.

ORDER - 4

"Washington courts have held that these same choice of law principles apply to the issue of punitive damages." *Id*. at 144–45 (examining *Kammerer v. W. Gear Corp.*, 96 Wn.2d 416 (1981); *Barr v. Interbay Citizens Bank of Tampa, Fla.*, 96 Wn.2d 692 (1981)).

In determining which jurisdiction has the most significant relationship to a particular issue, which in this case is the availability of punitive damages, the Court first weighs "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id*. at 143 (citing *Johnson*, 87 Wn.2d at 581).

Under this test, the Wilmottes fail to address the first, third, or fourth categories of contacts. The first and fourth categories of contacts favor applying Washington law because the injuries occurred in Washington and the parties' relationship is centered in Washington. Regarding the third category of contacts, Amtrak contends, and the Wilmottes do not dispute, that "[n]early all of the Plaintiffs allege in their complaints that they were domiciled in or were residents of Washington State at the time of the derailment." Dkt. 44 at 19. On the other hand, Amtrak is a citizen of the District of Columbia with its headquarters located there. Amtrak, however, has regional offices across the country, including a Seattle office with employees that oversee its affairs in Washington. These contacts favor applying Washington law, and the Wilmottes fail to establish that Amtrak's place of business in Delaware is any more significant than its place of business in Washington or headquarters in the District of Columbia.

Regarding the second category of contacts, the parties first dispute whether the Court should construe the facts in the light most favorable to the Wilmottes. The parties, however, fail to identify any disputed facts. Instead, the parties dispute which facts *caused* the injury. For example, the Wilmottes argue that "[t]he cause of Amtrak 501's derailment is not due to local, isolated or individual engineer actions, but rather stem from repeated, forewarned and institutional failures that resulted in three more people killed on its trains and dozens more seriously injured, including plaintiffs, on December 18, 2017." Dkt. 54 at 2. On the other hand, Amtrak argues that "[h]owever the causative conduct is framed, the undisputed evidence is that the decisions related to initiating this service and the operation of the train all occurred in Washington State." Dkt. 44 at 16. In essence, the parties are requesting that the Court determine causation, which is usually a question for the jury unless reasonable minds could not differ. *Hertog, ex rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 275 (1999). This case appears to be unique in that there is one defendant with multiple employees engaging in either overt acts or omissions that conceivably could have caused the plaintiffs' injuries. Some of those employees were in Delaware and some of those employees were in Washington. The parties fail to provide any authority, and the Court is unaware of any, that sets forth the standard when causation is in dispute. Thus, the Court will employ the general summary judgment standard and, for the purposes of the motion, construe causation in the Wilmottes' favor.

Even then, the contacts with Washington significantly outweigh the contacts with Delaware. The Court starts with the general "presumption that in personal injury cases, the law of the place of the injury applies . . . ." *Zenaida-Garcia v. Recovery Sys. Tech.,*

*Inc.*, 128 Wn. App. 256, 261–62 (2005). In support of that presumption, the Court finds that the third and fourth categories of contacts favor the application of Washington law. These contacts tip the scale heavily in favor of applying Washington law. On the other side, the Wilmottes rely on the seemingly arbitrary decision of Amtrak to place its FAST Act compliance department in Delaware and that department's failure to insure that the new track was FAST Act compliant.[4] On balance, the Court finds that Washington has the most significant contacts to the issue of punitive damages and grants Amtrak's motion to dismiss the Wilmottes' claim for punitive damages.

## IV.  ORDER

Therefore, it is hereby **ORDERED** that Amtrak's motion for summary judgment on punitive damages, Dkt. 44, is **GRANTED**.

Dated this 9th day of August, 2019.

_____
BENJAMIN H. SETTLE
United States District Judge

---

[4] In some punitive damages cases, courts have found that "the place of injury . . . is largely fortuitous." *Dobelle v. Nat'l R.R. Passenger Corp.*, 628 F. Supp. 1518, 1529 (S.D.N.Y. 1986). Conversely, in this case, it could be said that Amtrak's placement of its compliance department in Delaware is largely fortuitous because it engages in business throughout the nation and could have placed that department in Washington or some other state that does not allow punitive damages.