THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BLAINE WILMOTTE and MADISON WILMOTTE,

Plaintiffs,

v.

NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,

Defendant.

DALE SKYLLINGSTAD, individually,

Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,

Defendant.

AARON HARRIS, individually,

Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,

Defendant.

Case No. 2:18-cv-00086-BHS

**DEFENDANT'S TRIAL BRIEF**

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Defendant National Railroad Passenger Corporation ("Amtrak" or "Defendant") respectfully submits the following trial brief.

## I. STATEMENT OF FACTS

This case arises from the derailment of Amtrak Cascades Train 501 ("Amtrak 501") in DuPont, Washington on December 18, 2017. Plaintiffs Harris and Skyllingstad were passengers aboard Amtrak 501, and Plaintiff Wilmotte was a motorist riding on I-5 in a vehicle struck by derailing train car. Amtrak has already admitted liability for compensatory damages proximately caused by the derailment, and withdrew its former affirmative defenses of conditional failure to mitigate and allocation of fault. The Court has already determined that Plaintiffs may not seek punitive damages, nor do Plaintiffs have the ability to seek injunctive relief. For these reasons, the only issue for the upcoming jury trial is the amount of Plaintiffs' compensatory damages.

### A. Plaintiff Blaine Wilmotte

Mr. Wilmotte was riding in his employer's truck when a falling rail car struck the vehicle. Since the accident, he has resumed working in the same industry (metal gate and fence fabrication), but for an employer that he enjoys working for and in a position that requires less travel and fewer physically demanding tasks. Mr. Wilmotte was able to return to part-time work in February 2018 and full-time work in March 2018. His earnings for 2018, the first year following the derailment, were greater than his pre-incident earnings capacity despite not working the first two months of 2018. The evidence will show that Mr. Wilmotte has made an excellent recovery. Mr. Wilmotte brings a negligence claim to recover for his injuries resulting from the DuPont derailment. In addition, his wife, Madison Wilmotte, brings a loss of consortium claim. As Mr. Wilmotte was not a passenger on Amtrak 501, he does not allege a claim under the Washington Consumer Protection Action ("CPA").

The only issues for trial in Mr. Wilmotte's case are the amount of his compensatory damages and the amount of Mrs. Wilmotte's loss of consortium damages. At trial, Mr. Wilmotte will present evidence of his injuries, future prognosis, and claimed economic damages. Amtrak will present evidence as to Mr. Wilmotte's recovery since the derailment, his future prognosis,

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

and the true scope of his limited economic damages, particularly as Mr. Wilmotte admits that Amtrak has paid all of his medical bills.

**B. Plaintiff Dale Skyllingstad**

Mr. Skyllingstad was a passenger on Amtrak 501. He is a railroad enthusiast who has also made an excellent recovery and resumed his frequent practice of riding Amtrak and other passenger trains. He has made a particularly strong recovery from his alleged traumatic brain injury, having experienced little or no cognitive deficits, and no permanent cognitive defects. Again, Amtrak has paid all of Mr. Skyllingstad's medical bills relating to his treatment – which fact Mr. Skyllingstad admits. He is back to work in the same capacity as before the derailment. He brings negligence and CPA claims.

The only issue for a jury in Mr. Skyllingstad's case is the amount of his compensatory damages. At trial, Mr. Skyllingstad will present evidence of his injuries, future prognosis, and claimed economic damages. Amtrak will present evidence as to Mr. Skyllingstad's recovery since the derailment, his future prognosis, and the true scope of his limited economic damages.

**C. Plaintiff Aaron Harris**

Mr. Harris was also a passenger on Amtrak 501. He brings the same negligence and CPA claims as Mr. Skyllingstad. Mr. Harris was able to return to work in June of 2018 and relocated himself to New Hampshire in November 2018, where he works at a gym and performs job duties similar to those that he performed working at a floatation therapy business in Seattle prior to the derailment. Fortunately, Mr. Harris' neurocognitive deficits have improved over time, and he is functioning well, living independently and has a good future prognosis.

The only issue for a jury in Mr. Harris' case is the amount of his compensatory damages. At trial, Mr. Harris will present evidence of his injuries, future prognosis, and claimed economic damages. Amtrak also paid Mr. Harris' medical expenses. Amtrak will present evidence as to Mr. Harris' recovery since the derailment, his future prognosis, and the true scope of his limited economic damages.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

## II. ARGUMENT AND LEGAL AUTHORITY

### A. Admitted Liability

Amtrak has admitted liability for compensatory damages caused by the derailment, and the Court has determined that Plaintiffs cannot seek punitive damages; therefore, there are no contested negligence or other intent-related issues to address. Amtrak has moved *in limine* to exclude all liability evidence as irrelevant and prejudicial, including that which Plaintiffs claim is admissible under the guise of proving CPA claims that relate to claimed damages of roughly $60 per plaintiff (at best). Amtrak has also objected to each of Plaintiffs' proposed jury instructions related to liability, which would also be irrelevant and prejudicial.

### B. Damages

#### 1. Compensatory Damages

Plaintiffs will likely ask for large compensatory damages awards based on their respective injury claims. Plaintiffs and their experts will no doubt testify as to the symptoms of the various diagnoses and their impact on the Plaintiffs. However, it is important to note that there will also be ample testimony regarding the Plaintiffs' progress in managing their symptoms and their future prognosis. Amtrak highlights some of this testimony below.

#### 2. Economic Damages

##### a. Plaintiffs' Economic Damages Must Exclude Medical Expenses Paid by Defendant

Medical expenses paid on behalf of Plaintiff by Defendant or Defendant's insurance are not eligible for recovery, nor is evidence of such expenses admissible. *See Clark v. National R.R. Passenger Corp.*, 654 F.Supp. 376 (D. D.C. 1987) (excluding all direct and indirect evidence of plaintiff's medical expenses paid by Amtrak or its insurer); *Mead v. National R.R. Passenger Corp.*, 676 F.Supp. 92, 94 (D. Md. 1987) (excluding plaintiff's proffered evidence of medical expenses paid by Amtrak or its insurer).

The Court should not allow Plaintiffs to introduce medical bills or any other evidence of medical expenses at trial. The Wilmottes and Mr. Skyllingstad agree that they have no outstanding medical bills. Mr. Harris has declined to enter into a similar agreement; however,

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

he has not identified which, if any, medical bills remain unpaid. In all cases, however, Plaintiffs cannot recover for such paid medical expenses and evidence of those expenses is inadmissible. To the extent the issue comes up at trial, the jury should also be instructed that Plaintiffs cannot recover for these amounts.

**b. Plaintiff's Future Economic Loss Theories Rest on Unrealistic Premises**

Plaintiffs will attempt to advance their economic loss theories through their experts, vocational rehabilitation counselor Anthony Choppa and economist Frederick DeKay. Mr. Choppa and Dr. DeKay use unrealistic assumptions to project inflated loss scenarios. Amtrak will more thoroughly explore these flaws at trial, but provides examples of such flaws as they relate to each Plaintiff below.

(1) Blaine Wilmotte

Mr. Wilmotte returned to work full-time in March of 2018 and has continued full-time employment through today. Mr. Wilmotte's earnings for 2018, the first year following the derailment, were greater than his pre-derailment earnings capacity despite not working the first two months of 2018. Based on his full-time employment and increased earnings following the incident, there is no economic foundation for future loss of earnings for Mr. Wilmotte.

Amtrak anticipates that Mr. Wilmotte will attempt to present evidence to suggest that it is unlikely that he will be able to continue in his current job for the long term. This is at odds with the testimony of his treating physicians, which should be persuasive evidence for the jury. Even if the jury accepts this speculative evidence in light of Mr. Wilmotte's ability to work, they will hear evidence that Mr. Wilmotte can retrain quickly and mitigate his lost future earnings relatively quickly and at reasonable cost.

(2) Dale Skyllingstad

Mr. Skyllingstad returned to work in less than four months after the incident. He also is performing comparable duties, with corresponding hours, as compared to his pre-incident capacity. As such, his lost earnings calculation should be extremely limited. Mr. Skyllingstad's past loss of earnings is his 2018 pre-incident earnings capacity, less his actual 2018 earnings,

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

resulting in a loss of $20,592. There is no foundation for economic damages to include a future loss of compensation for Mr. Skyllingstad.

(3) Aaron Harris

Mr. Harris's wage loss claim relies upon the opinion of his expert economist, Dr. DeKay. Dr. DeKay's opinions rest on an obvious and implausible assumption – that after the year 2018, Mr. Harris' yearly earnings, had he not been injured, would have equaled that of the median average for a male with a bachelor's degree. This assumption is implausible because it does not take into account Mr. Harris' earning record prior to the derailment: in the years 2014 through 2017 (ages 23 to 26) Mr. Harris was earning 57.87% of the median earnings for males with a bachelor's degree, compared to U.S. Census data. Dr. DeKay's central assumption as to Mr. Harris's wage loss calculation is unsupported. The fact that Mr. Harris is essentially performing the same type of work that he did before the accident also belies any such claim.

**3. Punitive Damages.**

Amtrak prevailed on summary judgment on the issue of punitive damages. As such, evidence that goes to Amtrak's conduct would be irrelevant and prejudicial. Amtrak anticipates repeated efforts by the Plaintiffs to get such evidence before the jury regardless. Amtrak believes that the Court will exclude all such evidence under Federal Rule of Evidence 403 based on its lack of probative value, as well as both the incredible amount of time such evidence would waste and its sole purpose being to prejudice Amtrak and confuse the jury.

The Court should not permit Plaintiffs to introduce evidence of Amtrak's conduct, or reference punitive damages in any way. The Court's ruling on Amtrak's Motion for Summary Judgment is dispositive on this point, and forecloses the issue from consideration at trial.

**C. Plaintiffs' Consumer Protection Act Claims**

As noted above, Mr. Harris and Mr. Skyllingstad also raise a CPA claim, based on the theory that Amtrak did not disclose material facts in connection with its sale of tickets for the Amtrak 501 trip. Mr. Wilmotte raises no such claim. The issues with Mr. Harris and Mr. Skyllingstad's CPA claims at trial are two-fold. First, the CPA claims suffer from multiple legal

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

defects, which should preclude Plaintiffs from advancing them at trial. Second, even if the Court permits Plaintiffs to advance these claims, it should not permit the introduction of irrelevant, extensive, and highly prejudicial evidence under the guise of some possible, tangential relevance to the CPA. To the extent that the Court permits Plaintiffs' CPA claims to proceed, in any fashion, it should bifurcate those claims from the primary (and, in Mr. Wilmotte's case, sole) issue of personal injury damages.

**1. Plaintiffs' CPA Claims are pre-empted.**

Federal law pre-empts Plaintiffs' CPA claims as a matter of law.

49 U.S.C. § 24301(g), provides,

> **Nonapplication of rate, route, and service laws.** A State or other law related to rates, routes, or service does not apply to Amtrak in connection with rail passenger transportation.

As explained by the United States Supreme Court in *Morales v. Trans World Airlines, Inc.*, interpreting a similar statutory scheme, the phrase "relating to" expresses "a broad pre-emptive purpose." *Id.*, 504 U.S. 374, 383, 112 S. Ct. 2031, 2037, 119 L. Ed. 2d 157 (1992). In *Morales*, the Court determined: (1) that "[s]tate enforcement actions having a connection with, or reference to," carrier "'rates, routes, or services' are pre-empted" (*id.* at 384); (2) that such pre-emption may occur even if a state law's effect on rates, routes, or services "is only indirect" (*id.* at 386, internal quotation marks omitted); (3) that, in respect to pre-emption, it makes no difference whether a state law is "consistent" or "inconsistent" with federal regulation (*id.* at 386–387, emphasis deleted); and (4) that pre-emption occurs at least where state laws have a "significant impact" related to Congress' deregulatory and pre-emption-related objectives. *Id.* at 390. *Morales* held that, given these principles, federal law pre-empts States from enforcing their consumer-fraud statutes against deceptive airline-fare advertisements. *Id.* at 391; *see, e.g., Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 370–71, 128 S. Ct. 989, 995, 169 L. Ed. 2d 933 (2008) (pre-emption of state tobacco law where "effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate."); *American Airlines, Inc. v. Wolens*, 513 U.S. 219,

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

226–228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995) (federal law pre-empts application of a State's general consumer-protection statute to an airline's frequent flyer program); *Smith v. Comair*, Inc., 134 F.3d 254, 259 (4th Cir. 1998) (pre-emption of intentional tort claims).

Courts applying these principles to 49 U.S.C. § 24301(g) have reached similar results, including consistent pre-emption of state laws and consumer protection act claims related to "rates, routes, or service." *See, e.g.*, *Jenkins v. National Railroad Passenger Corp.*, 2008 WL 68685, * 12 (N.D.Ill. 2008) (citations omitted) (thoroughly examined the history and purpose of the Act, finding that plaintiff's state law consumer fraud and common law fraud claims were preempted)[1]; *Nat'l R.R. Passenger Corp. v. Caln Twp.*, No. CIV.A. 08-5398, 2010 WL 92518, at *3 (E.D. Pa. Jan. 8, 2010) (examining *Morales* and *Rowe*, and finding that 49 U.S.C. § 24301(g) pre-empted township weed control ordinance); *City of Seattle v. Burlington N. R. Co.*, 105 Wash. App. 832, 838, 22 P.3d 260, 263 (2001), aff'd, 145 Wash. 2d 661, 41 P.3d 1169 (2002) (reversed trial court decision, finding preemption of traffic ordinances pursuant to 49 U.S.C. § 24301(g)). The term service "include[s] items such as ticketing, boarding procedures, provision of food and drink, baggage handling, in addition to the transportation itself. * * * Thus, intentional tort claims that expressly refer to ticketing and the transportation itself are claims that fall under the services umbrella" and are preempted. *Jenkins*, 2008 WL 68685, *12 (citations omitted).

In fact, the court in *Jenkins* explained that where – as here – a requisite element of the state law consumer protection act claim is that the complained of acts occurred "in the course of conduct *involving trade or commerce*" (emphasis added), Amtrak's services necessarily are at issue for purposes of the pre-emption analysis. *Id.* at *16 ("because the claim directs the Court's inquiry to the provision of services in connection with rail passenger transportation, this

[1] *Jenkins* applied a "related to" standard that includes examination of objectives of the statute and the nature of the effect of the state law on Amtrak rates, routes, and service. *Id.* at *16. Amtrak prevails under this *Jenkins* standard, but also, notes that *Jenkins* relied on interpretation of another United States Supreme Court opinion, *Cal. Div. of Labor Standards Enforcement v. Dillingham Construc., N.A., Inc.*, 519 U.S. 316, 325-26, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997). The United States Supreme Court in *Rowe* – which post-dates both *Dillingham* and *Jenkins* – then re-examined the issue and affirmed its prior opinions in *Morales*. *Id.* at 371 ("In light of *Morales*, we find that federal law pre-empts the Maine laws at issue here.").

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

consumer fraud claim "relates to" Amtrak's service."); *citing Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). As with *Jenkins*, "in the conduct of any trade or commerce" is an essential element of Plaintiffs CPA claim (RCW 19.86.020) and the CPA defines "trade or commerce" as "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." RCW 19.86.010. In other words, Plaintiffs' CPA claims relate, by definition, to Amtrak's provision of services. If the complained of acts did not relate to Amtrak's provision of services, Plaintiffs would not have an actionable CPA claim for that reason alone.

Plaintiffs' CPA claims are pre-empted in their entirety and as a matter of law.

**2. <u>Plaintiffs' lack standing for their injunctive relief claim.</u>**

Even if their CPA claims were not pre-empted, which they are, Plaintiffs also lack standing with respect to any injunctive relief claim they might pursue in connection with the CPA. Standing is a jurisdictional issue, which "can be raised at any time, including by the court *sua sponte*." *United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997). To prove constitutional Article III standing, a litigant must satisfy the threshold requirement "by alleging an actual case or controversy … and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1983) (examining cases where plaintiffs lacked standing, despite actual, past harm, and because risk of continued, future harm was hypothetical only). A multitude of courts, including the United States Supreme Court and the Western District of Washington, have recognized this critical difference as between federal and state courts. *Id.*; *To-Ro Trade Shows v. Collins*, 100 Wn. App. 483, 489, 997 P.2d 960, 963 (2000), aff'd, 144 W.2d 403, 27 P.3d 1149 (2001) (citations omitted) (federal courts "have imposed prudential constraints flowing from the case and controversy requirement."); *Hardie v. Countrywide Home Loans Servicing LP* ("*Hardie I*"), No. C08-1286RSL, 2008 WL 8801053, at *2 (W.D. Wash. Dec. 8, 2008) (Lasnik); *Davis v. Homecomings Fin.*, No. C05-1466RSL, 2007 WL 1600809, at

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

*2 (W.D. Wash. June 1, 2007) (Lasnik). As explained by Judge Lasnik and the Western District of Washington in the unpublished *Hardie I* decision,

> A plaintiff "must demonstrate 'a real and immediate threat that he would again' suffer the injury to have standing for prospective equitable relief" in federal court. *Davis v. Homecomings Financial*, No. C05–1466RSL, 2007 WL 1600809, at *2 (W.D.Wash. June 1, 2007) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). By contrast, in state court "any person who is injured" may have standing to pursue equitable relief based on a violation of Washington's CPA. RCW 19.86.090.

*Id.* at *2 (summary judgment dismissal of equitable CPA claims, after order certifying class, and because claims were based on past conduct not likely to repeat with Plaintiffs specifically); *see also City of Los Angeles v. Lyons*, 461 U.S. at 109 ("If Lyons has made no showing that he is realistically threatened by a repetition of his experience of October, 1976, then he has not met the requirements for seeking an injunction in a federal court, whether the injunction contemplates intrusive structural relief or the cessation of a discrete practice.").

By Plaintiff's own admission, Amtrak has the ability to comply with the FAST Act in one of two ways. *See* Dkt. No. 64, p. 6, ln. 10-15. Plaintiffs cannot reasonably characterize an oversight by an Amtrak employee on December 18, 2017 as ongoing and future non-compliance with FAST Act, and their CPA claims fail substantively for that reason alone.

However, even if we assume Amtrak's knowledge, duty to disclose, and failure to disclose the events of December 18, 2017 (i.e. the omission of the curve at Milepost 19.8 from the General Order, that PTC was not operable on the track alignment, etc.), the most Plaintiffs can argue in support of Article III standing is that:

- They might someday purchase another ticket,
- Which might involve a train not equipped with PTC _and_ during which trip someone fails to follow a legally required safety-related procedure or protocol, similar to what occurred on December 18, 2017;
- Which failure is known, but not disclosed when Plaintiffs purchase tickets, and
- Which undisclosed material facts will likely then result in additional harm to Plaintiffs.

As made clear in *City of Los Angeles* and federal cases that followed, these facts are not sufficient to establish standing under Article III. There is no reasonable basis for Plaintiffs to speculate that

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

these events will (or even could) repeat, and result in future harm to Plaintiffs – or anyone. *City of Los Angeles*, 461 U.S. at 108 (noting that there were no allegations of further encounters between plaintiff and the police in the five months that elapsed between the incident and filing of the complaint). For these reasons, Plaintiffs lack standing on any injunctive relief claims.

**3. Plaintiffs' CPA arguments fail as a matter of law, or are based on undisputed allegations, such that there is no basis to introduce otherwise irrelevant and prejudicial evidence.**

Each of Plaintiffs' allegations in support of their CPA claims fail as a matter of law, or are undisputed. *See* Dkt. No. 62, pp. 4, Nos. 1-8 (allegation list).

First, as a national rail carrier, Amtrak is subject to a high degree of federal regulation, and is largely exempt from state regulation. As noted above, Amtrak's enabling statute makes it plain that state laws, including the CPA, that purport to relate to "rates, routes, or service do[] not apply to Amtrak in connection with rail passenger transportation." 49 U.S.C. § 24301(g). Yet, this is exactly how Plaintiffs want to use the CPA. Each of their supporting allegations undisputedly relate to "rates, routes, or service," and are thus pre-empted as a matter of law.

Second, even in the absence of a specific pre-emption statute (49 U.S.C. § 24301(g)), the CPA itself precludes claims based on "any action permitted by any regulatory body or officer acting under statutory authority of the United States." RCW 19.86.170. Plaintiffs' first and fifth allegations (improper training of operators and personnel, and failure to implement adequate safety management system) are not actionable under the CPA for the independent reason that Plaintiffs have never argued and cannot show any failure by Amtrak to comply with federal engineer certification and safety requirements. Plaintiffs' second allegation (failure to provide reasonably safe and crashworthy equipment) is not actionable under the CPA for the independent reason that the FRA expressly permitted use of the equipment at issue, i.e. the Talgo trainset.

Third, Plaintiffs' third allegation (unspecified failure to implement federal requirements for safe train operations) is facially insufficient and, by definition, relates to Amtrak services, thus triggering pre-emption pursuant to 49 U.S.C. § 24301(g).

Fourth, Amtrak does not dispute several of Plaintiffs' allegations. For example, Amtrak

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

does not dispute that the conductor on Train 501 failed to "provide an advance verbal warning" (because Amtrak's General Order had not been updated to include the curve at Milepost 19.8 as a FAST Act location) and that the engineer failed to "safely reduce speed in advance" of the curve. Dkt. No. 64, pp. 4, Nos. 4, 7-8. Likewise, Plaintiffs' allegation that Amtrak did not perform "a reasonable hazard analysis before operating" ignores the irrefutable fact that Sound Transit and WSDOT made and/or directed these operational decisions. *Id.* at No. 6 (Plaintiffs' allegation); *but see* Dkt Nos. 44, § II.B.2, and 45 (Yates Decl.), Exs. H-Q. Where, as here, the key facts are not disputed, whether a particular action or conduct gives rise to a CPA violation is a question of law. *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 149–50, 930 P.2d 288 (1997) (citations omitted). Thus, the Court, not the jury, should decide this element. Evidence relating to these issues is irrelevant (tenuous probative value, at best), which cannot justify the extensive and time-consuming introduction of such evidence at trial, or resulting prejudice to Amtrak and jury confusion. FRE 403.

To have recourse, Plaintiffs must first establish a recoverable claim. Here, an accident occurred as the result of an isolated incident in which an Amtrak engineer failed to comply with FAST Act safety procedures. In addition to raising FAST Act noncompliance (pre-empted for the reasons set forth above), Plaintiffs claim a variety of vague ways in which Amtrak *might* have prevented Amtrak 501's derailment and then, alleges that because Amtrak did not take those steps, it was required to disclose not having taken those steps to everyone who purchased a ticket. Plaintiffs' CPA claim is circular, and unsupported as a matter of law. Plaintiffs' attempted expansive use of the CPA would transform every negligence action into a CPA claim, which is not the law in Washington.

### 4. The Court Should Bifurcate the Consumer Protection Act Claims from the Personal Injury Damages Claims

Under the circumstances, if the Court finds that Plaintiffs' CPA claims are not pre-empted and permits their CPA claims to proceed, the Court should bifurcate the trial of these claims in the interest of fairness and judicial economy. This Court has the discretion to bifurcate claims or

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

issues "to avoid prejudice, or when separate trials will be conducive to expedition and economy[.]" *Yanni v. City of Seattle*, No. C04-0896L, 2005 WL 2180011, at *1 (W.D. Wash. Sept. 9, 2005) (quoting Fed. R. Civ. P. 42(b) and granting bifurcation); *EEOC v. Kovacevich "5" Farms*, No. 1:06-cv-00165, 2006 U.S. Dist. LEXIS 70798, at *3 (E.D. Cal. Sept. 19, 2006) ("'Rule 42(b) provides the district court with discretion to subdivide the case in whatever manner seems dictated by the circumstances.'") (*quoting* Wright & Miller, *9 Federal Practice and Procedure* § 2389 (2d. ed. 1995)).

Plaintiffs' best-case CPA damages are nominal.[2] Mr. Harris claims CPA damages of a $10.40 Lyft ride to the station and the 17-day loss of the $64 he paid for his ticket. Dkt. 118. Mr. Skyllingstad claims the 47-day loss of the $12 he paid for his ticket and the 89 miles his parents drove to pick up vehicles at the Tacoma and Olympia train stations. Using the IRS' 2017 mileage rate, the 89 miles works out to $47.615. Amtrak has already refunded the ticket amounts. Under the circumstances, it would be unfair (and unnecessary) for the jury to hear one or more full days of liability evidence that is relevant only to such incredibly limited claims.

Further, to prevail on a CPA claim, a private plaintiff must prove five elements: (1) unfair or deceptive act or practice ("UDAP"); (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property, and (5) causation. *Hangman Ridge Training Stables v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780, 719 P.2d 531 (1986); *Stephens v. Omni Ins. Co.*, 138 Wash. App. 151, 166, 159 P.3d 10, 18 (2007), *aff'd sub nom. Panag v. Farmers Ins. Co. of Washington*, 166 Wn.2d 27, 204 P.3d 885 (2009). At trial, Amtrak will dispute certain of these elements (as set forth above). The parties engaged in extensive liability discovery, primarily on Plaintiffs' punitive damage claims, and that evidence has little to no probative value in light of (1) Amtrak's stipulations, (2) this Court's dismissal of punitive damages, and (3) above described problems with Plaintiffs' remaining CPA theories.

---

[2] The Court has already confirmed that Plaintiffs cannot seek damages for personal injuries under the CPA. It declined, however, to grant summary judgment in favor of Amtrak on the issue of whether the temporary loss of Plaintiffs' ticket purchase price could constitute injury to business or property, sufficient to permit Plaintiffs' CPA claim to move forward to trial.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Amtrak also will be prejudiced with respect to Plaintiff Wilmotte's case, for which the introduction of CPA related evidence will serve *no conceivable, legitimate* purpose and can only result in jury confusion and unnecessary time and expense. The court consolidated Plaintiffs' Harris and Skyllingstad's cases with Plaintiff Wilmotte's case for ease of trial. That decision may need to be revisited given the unique nature of the Wilmotte case, as compared to the Skyllingstad and Harris cases. Mr. Wilmotte is an injured motorist, not a passenger, and has no CPA claim. As such, it would be especially prejudicial to Amtrak and a waste of the Court and the jury's time if the Court permits Mr. Harris and Mr. Skyllingstad to put on an UDAP case before personal injury damages are determined. Instructing the jury not to consider liability evidence when deciding compensatory damages in the Wilmotte case simply cannot cure the immense prejudice that would result from trying the CPA and personal injury claims together. It would be particularly unfair also because Amtrak admitted liability for the personal injury damages when it answered the Complaints over a year ago.

Further, bifurcating these issues would be a relatively simple matter. The Court would conduct a brief personal injury damages trial first (thereby avoiding the prejudice of the irrelevant liability/UDAP evidence), and after those verdicts are returned, conduct the CPA trial (if any) to resolve the damages issues, if any. As noted, there is no basis for injunctive relief and this court is unable to award such relief pursuant to 49 USC 24301 (g) and the standing issue discussed above. This would streamline any attorneys' fees award analysis by keeping the issues separate. More importantly, it would eliminate the likelihood of prejudice to Amtrak and confusing the jury through extensive, but otherwise irrelevant, intent and liability evidence.

Given the seriousness and strength of Amtrak's pre-emption, standing and other arguments, it does not make sense to risk these proceedings so that Plaintiffs' can introduce evidence in no way relevant to their personal injury claims and highly prejudicial to Amtrak.

**5. <u>The Court Should Direct a Verdict for Amtrak on the CPA Claims</u>**

Here, even if their CPA claims were not pre-empted, the law is clear and Plaintiffs cannot establish the elements required to prevail, requiring a directed verdict in Amtrak's favor.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Specifically, in the case of Amtrak 501, an individual employee, the engineer, unfortunately failed to slow for the speed restriction. Amtrak had no way to anticipate the error, much less a legal duty to disclose the risk that such an error might occur to every ticket purchaser for Amtrak 501. To hold otherwise would turn every ticket sale into a potential UDAP lawsuit.

In other words, Plaintiffs' claims indisputably arise from a single, incident. Although an unfortunate number of people were involved—fewer than 100 people have claimed injuries as a result. Washington did not design its CPA to prevent these types of harm, and Plaintiff is unable to establish the first, second, and/or third elements of their CPA claims for these reasons alone. *See, e.g., Behnke v. Ahrens*, 172 Wn.App. 281, 295, 294 P.3d 729, 737 (2012) ("To establish an unfair or deceptive act, there must be shown a real and substantial potential for repetition, as opposed to a hypothetical possibility of an isolated unfair or deceptive act's being repeated."); *Eastlake Const. Co. v. Hess*, 102 Wn.2d 30, 52 (1984) (potential for repetition shown by establishing that the act is "part of a protracted course of conduct."); *Bavand v. OneWest Bank, F.S.B.*, 176 Wn.App. 475, 506, 309 P.3d 636, 652 (2013) (citation omitted) (five factors used to determine whether act or practice affects he public interest, which include considerations such as acts as part of a pattern, repeated acts prior to the one involving plaintiff, real and substantial potential for repetition after plaintiff, etc.); *Hangman Ridge*, 105 Wn.2d at 785 (deceptive act must have capacity to deceive "a substantial portion of the public" to be actionable); *LaFrance Corp. v. Werttemberger*, No. C07-1932Z, 2008 WL 5068653, at *5 (W.D. Wash. Nov. 24, 2008) (dismissing CPA claim where alleged injury was unique to plaintiff's case); *Lightfoot*, 86 Wn.2d at 333 (purpose is to protect the public from acts or practices which are injurious to consumers, not to provide an additional remedy for private wrongs which do not affect the public generally). Plaintiff cannot establish at least three of the five elements as a matter of law, while Amtrak need only prove one failure to obtain a directed verdict in its favor on Plaintiffs' CPA claims.

**D. <u>NTSB Materials and Findings are Inadmissible.</u>**

The NTSB issues two types of reports in the investigation of an accident: a board accident and factual accident report. 49 C.F.R. § 835.2. A board accident report is "the report containing

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

the Board's determinations, including the probable cause of an accident." *Id.* A factual accident report is "the report containing the results of the investigator's investigation of the accident." *Id.* Courts treat these two report types differently in terms of their admissibility and use in court.

Federal law explicitly prohibits the use or admittance into evidence of NTSB board accident reports, whether in full or in part, "in a civil action for damages resulting from a matter mentioned in the report." 49 U.S.C. § 1154(b); 49 C.F.R. § 835.2. Board accident reports are inadmissible in such actions because determination of probable cause is for the jury or fact finder. *See Britton v. Dallas Airmotive, Inc.*, No. 1:07-CV-00547-EJL, 2011 WL 13196592, at *2 (D. Idaho May 20, 2011) (granting plaintiffs' Motion in Limine to exclude the NTSB board report and all opinions from the Board, and denying plaintiffs' Motion in Limine to exclude the NTSB factual reports of the investigators). The use of NTSB factual reports appears to be an open question in the Ninth Circuit, as addressed in more detail in Amtrak's Motions in Limine.

Amtrak has moved *in limine* to exclude any references to the NTSB investigation materials and findings. The reports are statutorily inadmissible in a civil action for damages resulting from a matter mentioned in the report. 49 U.S.C. § 1154(b). Additionally, the findings are irrelevant to this matter as they go to the cause of the incident, which is not at dispute here as Amtrak has admitted liability for compensatory damages.

**E. <u>Positive Train Control</u>**

For the reasons set forth in Amtrak's Motions in Limine, the Court should exclude all references to Positive Train Control (PTC). Positive Train Control is an integrated system that relies on components along the railroad right of way, in the locomotive or other control unit of the train, and in the host railroad or other entity's "back office," which function together to automatically slow and stop trains that are at risk of exceeding a speed restriction. While Amtrak did not have a PTC system in place for the Point Defiance Bypass at the time of the incident, it also *<u>was not required to have a PTC system in place until after December 18, 2017</u>* – the date that the incident occurred. 49 C.F.R. § 236.1005(b)(7)(i) ("Each railroad must complete full implementation of its PTC system by December 31, 2018."). Because Amtrak was not required

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

to utilize or operate PTC at the time of the derailment, the absence of such a system at the time of the derailment is irrelevant, and any Inferences created by such evidence or argument would be improper and prejudicial.

Further, even if some duty to implement PTC existed on December 18, 2017 – though it did not, as a matter of law – any PTC argument is still pre-empted by federal statute. "Under the preemption doctrine, states are deemed powerless to apply their own law due to restraints deliberately imposed by federal legislation." *Veit, ex rel. Nelson v. Burlington N. Santa Fe Corp.*, 171 Wn.2d 88, 102, 249 P.3d 607, 614 (2011) (holding that excessive track speed claims based on Washington State tort law were preempted). Where, as here, a railroad safety issue is regulated completely by federal law, state law tort claims based on a different standard are preempted under long-standing and well-established United States Supreme Court precedent. *See, e. g., CSX Transp., Inc. v. Easterwood*, 507 U.S. 658 (1993) (excessive track speed claims preempted); *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344 (2000) (grade crossing safety device claims preempted). Moreover, the installation of PTC on this territory would have been the responsibility of the owner of the track, Sound Transit, not Amtrak. The Court should also prohibit Plaintiffs from referencing Positive Train Control as it is pre-empted by federal statute.

**F. <u>Evidence that Amtrak's Receives Government Subsidies Should Not Be Admitted</u>**

As a Congressionally-created corporation that is more than 50 percent owned by the United States, Amtrak receives annual subsidies from the federal government. Such evidence has no bearing on any issue the jury will be asked to decide, and is therefore irrelevant and should be excluded. FRE 401-402. While it is unclear whether such evidence could serve *any* permissible purpose, there *is a danger* that it could confuse or prejudice the jury. FRE 403. For example, by suggesting that Amtrak either is affiliated with or controlled by the government or has government resources from which payment of a higher damages award could be made. Any such implication would be improper.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

**G. Adverse Publicity**

Amtrak anticipates significant adverse publicity surrounding the trial, as these are the first of the DuPont matters to reach trial. The risk of bias of public opinion will be far higher amidst this increased publicity. Amtrak raises this issue now, by way of notice to the Court in the event that specific concerns arise in the course of the trial, and because Amtrak anticipates the need for additional inquiries (either by Amtrak or the Court) to ensure the absence of juror bias.

## III. CONCLUSION

Amtrak looks forward to the trial of this matter set to commence on September 3, 2019 at 9:00 a.m.

DATED: August 15, 2019

LANE POWELL PC

By *s/ Tim D. Wackerbarth*
Tim D. Wackerbarth, WSBA No. 13673
wackerbartht@lanepowell.com
Andrew G. Yates, WSBA No. 34239
yatesa@lanepowell.com
Warren E. Babb, Jr., WSBA No. 13410
babbw@lanepowell.com
Jeffrey M. Odom, WSBA No. 36168
odomj@lanepowell.com
Katie Bass, WSBA No. 51369
bassk@lanepowell.com

*Attorneys for Defendant National Railroad Passenger Corporation*

LANDMAN CORSI BALLAINE & FORD, PC

By *s/ Mark S. Landman*
Mark S. Landman, *Pro Hac Vice*
mlandman@lcbf.com
John A. Bonventre, *Pro Hac Vice*
jbonventre@lcbf.com

*Attorneys for Defendant National Railroad Passenger Corporation*

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

**CERTIFICATE OF SERVICE**

The undersigned certifies under penalty of perjury under the laws of the United States and the State of Washington that on the 15th day of August, 2019, the document attached hereto was presented to the Clerk of the Court for filing and uploading to the CM/ECF system. In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following persons:

Robert N. Gellatly
David M. Beninger
Andrew Hoyal
Luvera Law Firm
701 Fifth Avenue, Suite 6700
Seattle, WA 98104-7016
robert@luveralawfirm.com
david@luveralawfirm.com
andy@luveralawfirm.com

☑ by CM/ECF
☐ by Electronic Mail
☐ by Facsimile Transmission
☐ by First Class Mail
☐ by Hand Delivery
☐ by Overnight Delivery

Sean P. Driscoll
Kevin P. Durkin
Kristopher S. Riddle
Clifford Law Offices
120 N. LaSalle Street, 31st Floor
Chicago, IL 60602-2554
spd@cliffordlaw.com
kpd@cliffordlaw.com
ksr@cliffordlaw.com

☑ by CM/ECF
☐ by Electronic Mail
☐ by Facsimile Transmission
☐ by First Class Mail
☐ by Hand Delivery
☐ by Overnight Delivery

DATED this 15th day of August, 2019.

*s/ Alisa R. Flabel*
Alisa R. Flabel, Legal Assistant

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107